UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CR. NO. 1:23-CR-209 |
| | : | |
| v. | : | |
| | : | (Judge Wilson) |
| BRIAN R. CLELAND, | : | |
| CARLOS A. GRIJALVA, | : | |
| | : | |
| Defendants. | : | |

**FILED**
HARRISBURG, PA

APR 0 2 2025

PER_____
DEPUTY CLERK

**F I R S T
S U P E R S E D I N G
I N D I C T M E N T**

THE GRAND JURY CHARGES:

At times material to this Indictment:

**COUNT 1**
18 U.S.C. § 1349
(Conspiracy to Commit Wire Fraud and Bank Fraud)

INTRODUCTION

1. Defendant, BRIAN R. CLELAND, was a resident of Los Angeles County, California, in the Central District of California.

2. Defendant, CARLOS A. GRIJALVA, was a resident of Los Angeles County, California and Ventura County, California, in the Central District of California.

3. BRUCE JIN was a resident of Los Angeles County, California, in the Central District of California.

4. BRUCE JIN controlled and operated multiple companies, including Jin Commerce LLC, Ample International Inc, Yu Pacific Logistics LLC, Pacific Goods Supply Inc, KB Supply Inc, and Cathy Group Inc.

5. BRIAN R. CLELAND and CARLOS A. GRIJALVA controlled and operated multiple companies, including MexUS Service Inc, CCB Group 1, CCB Group 2, CCB Group 3, GC Accounting Inc 1, GC Accounting Inc 2, GC Accounting Inc 3, and Group Mex USA Inc, d/b/a/ Masqind (a.k.a., MASQ Industries, Inc.).

6. In addition to the companies listed above, BRIAN R. CLELAND was also associated with other companies, including another company that he controlled and operated by the name of CLECO Inc.

7. COCONSPIRATOR 1 was a citizen of Saint Kitts and Nevis and a resident of Orange County, California, in the Central District of California.

8. COMPANY 1 was incorporated in the State of California on or about May 2019. COMPANY 1 was associated with addresses in or around Los Angeles County, California and Orange County, California.

9. COCONSPIRATOR 1 incorporated and was the CEO of COMPANY 1, which was described in official filings as an importer and exporter of cable and steel products. BRUCE JIN acted as a representative of COMPANY 1.

10. COCONSPIRATOR 2 was associated with an address in China and maintained one or more accounts at banks located in China.

11. COMPANY 2 was associated with an address in China and maintained accounts at banks located in China. COCONSPIRATOR 2 was associated with COMPANY 2. BRUCE JIN acted as a representative of COMPANY 2.

12. IDENTITY THEFT VICTIM 1 was a resident of Etters, PA, in the Middle District of Pennsylvania.

13. IDENTITY THEFT VICTIM 2 was a resident of York, PA, in the Middle District of Pennsylvania.

14. IDENTITY THEFT VICTIM 3 was a resident of Lebanon, PA, in the Middle District of Pennsylvania.

15. IDENTITY THEFT VICTIM 4 was a resident of Biglerville, PA, in the Middle District of Pennsylvania.

16. IDENTITY THEFT VICTIM 5 was a resident of Ortanna, PA, in the Middle District of Pennsylvania.

17. IDENTITY THEFT VICTIM 6 was a resident of Chambersburg, PA, in the Middle District of Pennsylvania.

18. IDENTITY THEFT VICTIM 7 was a resident of Middlesex County, NJ, in the District of New Jersey.

19. IDENTITY THEFT VICTIM 8 was a resident of Clearfield County, PA, in the Western District of Pennsylvania.

20. IDENTITY THEFT VICTIM 9 was a resident of Cranberry Township, PA, in the Western District of Pennsylvania.

21. IDENTITY THEFT VICTIM 10 was a resident of New Holland, PA, in the Eastern District of Pennsylvania.

*Unemployment Compensation*

22. The federal-state unemployment compensation program was created by the Social Security Act of 1935. The unemployment compensation program, also known as the unemployment insurance program, provides unemployment benefits to eligible workers who are unemployed through no "fault" of their own (as determined under State law) and meet other eligibility requirements of applicable state law. Unemployment insurance payments are intended to provide temporary financial assistance to unemployed workers who meet the requirements of state law. Each state administers a separate unemployment insurance program within guidelines established by federal law. Eligibility for unemployment insurance, including benefit amounts and the length of time benefits are available, is determined by the state law under which unemployment insurance claims are established.

23. The federal-state unemployment compensation ("UC") program is funded by a federal tax levied on employers and a state tax also levied on employers. The federal tax is used to fund a number of different unemployment compensation-related expenditures, including

5

all federal and state administrative costs associated with unemployment compensation programs and the federal share of benefits paid under the Federal-State Extended Unemployment Compensation Act of 1970. The state tax is used to fund the benefit payments for eligible recipients.

24. The Pennsylvania Department of Labor and Industry ("PADOL") administers Pennsylvania's unemployment compensation program on behalf of the federal government. PADOL is located in Harrisburg, PA, in the Middle District of Pennsylvania.

25. A person may not receive UC in Pennsylvania unless the person is unemployed or under-employed through no fault of his or her own and meets certain financial eligibility requirements. UC is not available to self-employed individuals, individuals who are not able and available to work, or individuals who are not eligible to work in the United States. In order to receive UC in Pennsylvania, a person must submit a claim for UC and have that claim approved by PADOL. The claimant must provide his or her name, mailing address, social security

6

number, date of birth, last employer's name and address, and reason for separation. A claimant must apply for UC over the Internet.

26. Once the initial Pennsylvania application is approved, claimants must submit biweekly claims to PADOL over the telephone or the Internet in which they certify the following: (1) they are still unemployed or under-employed; (2) if they are working, the amount of income earned; and (3) if they are able and available to work. PADOL pays UC benefits via a debit card, hard-copy check mailed to the claimant's mailing address, or direct deposit into the bank account of the claimant's choice. Because legitimate UC claimants may not have bank accounts, they may, for example, elect to have their UC funds deposited into the account of a third party with whom they have a relationship.

27. The biweekly claims submission process in Pennsylvania may also be conducted entirely over the Internet. The claims process does not require any additional supporting documentation or verification of identity.

28. Once a claimant is approved as eligible for UC benefits, PADOL directs the Pennsylvania Treasury Department, located in Harrisburg, Pennsylvania, in the Middle District of Pennsylvania, to disburse UC funds to the claimant.

29. Other states operate their own federal-state unemployment compensation systems in a similar manner. Claimants must meet the criteria to receive UC as determined by the state from which the benefits are being claimed. As in Pennsylvania, claimants in other states are generally required to provide a range of information, including personal identifier information ("PII") and their basis for receiving UC, and they must make additional claims on a periodic basis to continue receiving additional UC.

*Economic Impact Payments*

30. As a result of the COVID-19 pandemic, starting in March 2020, the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) provided Economic Impact Payments ("stimulus payments") of up to $1,200 per adult for eligible individuals and $500 per qualifying child

under age 17. For a family of four, these Economic Impact Payments provided up to $3,400 of direct financial relief.

31. The COVID-19-related Tax Relief Act of 2020, enacted in late December 2020, authorized additional Economic Impact Payments of up to $600 per adult for eligible individuals and up to $600 for each qualifying child under age 17.

32. The American Rescue Plan Act of 2021, enacted in early March 2021, provided Economic Impact Payments of up to $1,400 for eligible individuals or $2,800 for married couples filing jointly, plus $1,400 for each qualifying dependent, including adult dependents.

33. In 2022, the Internal Revenue Service credited U.S. taxpayers up to $1,400 for tax year 2021 if they were due but had not previously received the full amount of the third Economic Impact Payment. These credits were regularly made through ACH deposits into taxpayers' bank accounts along with the transaction code "IRS TREAS 310" and a description of "TAX REF" or "TAXEIP3."

## THE CONSPIRACY TO OBTAIN PUBLIC FUNDS AND ITS OBJECTS

34. Paragraphs 1 through 33 are incorporated here.

35. From on or about 2020 until on or about 2022, in the Middle District of Pennsylvania, and elsewhere, the defendants,

**BRIAN R. CLELAND, and
CARLOS A. GRIJALVA,**

did knowingly conspire, confederate, and agree, together and with other persons both known and unknown to the Grand Jury, to commit offenses against the United States and to defraud the United States, that is:

to devise a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and to willfully participate in such a scheme and artifice with knowledge of its fraudulent nature, with the intent to defraud, and for the purpose of executing such scheme and artifice, to cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, any writing, sign, signal, picture and sound, in violation of Title 18, U.S.C. § 1343 (Wire Fraud); and

to execute and attempt to execute a scheme and artifice to defraud a

10

financial institution, as defined in 18 U.S.C. § 20, and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody or control of, a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, U.S.C. § 1344 (Bank Fraud).

MANNER AND MEANS OF THE CONSPIRACY

It was part of the conspiracy that:

36. BRIAN R. CLELAND, CARLOS A. GRIJALVA, BRUCE JIN, and COCONSPIRATOR 1 established and acquired control of various companies. For instance, BRUCE JIN registered Jin Commerce LLC with the State of California on or about November 6, 2019 and filed a statement of information on or about June 3, 2021 listing himself as the CEO and Secretary of Ample International, Inc. and describing its type of business as "gen merchandise distributor."

37. BRIAN R. CLELAND formed MASQ Industries, Inc. in the State of Colorado on or about April 15, 2020 and CCB Group Inc. in the State of Colorado on or about October 27, 2021. BRIAN R. CLELAND also incorporated CLECO, Inc. in the State of California on or about

September 27, 2018. On or about October 30, 2018, BRIAN R. CLELAND filed a statement of information with the State of California listing himself as the CEO, Secretary, and CFO of CLECO, Inc. and describing the type of business as "hotel management."

38. COCONSPIRATOR 1 filed articles of incorporation for COMPANY 1 with the State of California on or about May 21, 2019. On or about September 27, 2021, COCONSPIRATOR 1 filed a statement of information with the State of California listing COCONSPIRATOR 1 as the CEO of COMPANY 1 and describing the type of business as "cable and steel products" and "import/export."

39. BRIAN R. CLELAND, CARLOS A. GRIJALVA, BRUCE JIN, and COCONSPIRATOR 1 opened and controlled a number of bank accounts associated with their businesses. For instance, BRUCE JIN used multiple accounts for Ample International Inc. and Jin Commerce LLC, including accounts at East West Bank, Bank of the West, Bank of America, and Chase Bank. BRUCE JIN also used a number of different Bank of America accounts for Yu Pacific Logistics LLC, Pacific Goods Supply Inc, KB Supply Inc, Cathy Group Inc, and other companies.

12

40. BRIAN R. CLELAND and CARLOS A. GRIJALVA used accounts at Bank of America, including an account for MexUS Service Inc, an account for Group Mex USA Inc, approximately three accounts for CCB Group, and approximately three accounts for GC Accounting. BRIAN R. CLELAND and CARLOS A. GRIJALVA also utilized accounts at other banks, including an Avidia Bank account in the name of Group Mex USA Inc, d/b/a Masqind ("Group Mex") and one or more Chase Bank accounts in the name of Group Mex USA Inc. BRIAN R. CLELAND also used an account at Bank of America for CLECO, Inc.

41. A cell phone number for CARLOS A. GRIJALVA was associated not only with accounts in the names of CARLOS A. GRIJALVA and BRIAN R. CLELAND but was also utilized in connection with payments to Ample International Inc and Jin Commerce LLC, companies run by BRUCE JIN.

42. Fraudsters, including some believed to be located in or around China, established thousands of accounts at banks across the United States without the knowledge or lawful authorization of the individuals whose PII was being used to create the accounts.

13

43. Fraudsters, including some believed to be located in or around China, were also responsible for generating fraudulent claims for UC payments from Pennsylvania and a number of other states.

44. On or about September 17, 2021, thousands of records were inserted into a database table in the server supporting the Pennsylvania UC system. These records were inserted without lawful authorization over a period of several hours, and they contained names and associated PII sufficient to make a claim for unemployment compensation.

45. After these records were inserted into the database table, numerous claims were submitted to the Pennsylvania UC system and certified using fraudulent means. The Pennsylvania Treasury Department then issued payments to apparent UC claimants; however, rather than payments being made to accounts controlled by the claimants themselves, the funds were instead deposited into the various bank accounts that had been fraudulently created using third-party PII.

46. Millions of dollars of fraudulent UC payments were issued to accounts by the Pennsylvania Treasury Department and other state

treasuries around the United States. These UC payments were, at times, issued in the names of individuals who were legitimately entitled to such payments and, at other times, were issued in the names of individuals who were not entitled to such payments. In either case, the UC payments were issued to claimants whose names differed from the names on the bank accounts into which the funds were deposited.

47. These UC payments were issued to bank accounts in the names of third parties without the knowledge of the purported claimants and without the knowledge of the purported accountholders.

48. BRUCE JIN, through bank accounts at East West Bank in the names of Ample International, Inc. and Jin Commerce LLC, received over $12 million in funds from on or about March 2021 until on or about October 2021. The memos associated with these transactions in bank records often stated "N95," "KN95," and "mask" to make it appear as if payments were linked to COVID-19-related personal protective equipment ("PPE").

49. One of these accounts was an East West Bank account ending in -4023 in the name of Jin Commerce, LLC. BRUCE JIN opened the

15

account on or about December 2019 but used the account very little until on or about May 2021, when the account received a $65,000 credit from Ample International Inc. for what was described in the transaction record as "PPE." On or about the same day, an outgoing wire transfer for approximately $64,000 was made to COCONSPIRATOR 2 with an account at a bank based in China. Starting on or about September 16, 2021, the account received hundreds of deposits in rapid succession totaling nearly $700,000, with all of the transfers occurring on a small number of dates, until they suddenly stopped on or about October 29, 2021. The memo associated with every deposit stated, "mask." The funds were quickly depleted from this account in a series of large-dollar, round-number debits and outgoing international wire transfers.

50. The funds flowing to Jin Commerce LLC and Ample International Inc. were, in reality, derived from UC payments. For instance, on or about August 11, 2021, an account ending in -0852 was opened at Chase Bank in the name of A.S. From on or about August 20, 2021 until on or about September 29, 2021, the account received a series of UC payments—not in the name of A.S.— from Pennsylvania

16

for amounts ranging from approximately $344 to approximately $3,476. On or about September 21, 2021, approximately $7,989 was debited from the account to Ample International Inc., and on or about October 1, 2021, approximately $2,916 was debited from the account to Jin Commerce LLC.

51. Ample International Inc. also received transfers totaling approximately $4,325.64 from a Chase Bank account ending in -4478 from on or about April 22, 2021 until or on or about May 24, 2021. On or about June 10, 2021, Masqind, a.k.a., MASQ Industries, operated by BRIAN R. CLELAND and CARLOS A. GRIJALVA, received approximately $1,101.00 from this same Chase Bank account. This account was opened on or about March 18, 2021 in the name of J.H., who was associated with an address in Bradenton, Florida. The account initially received approximately $4,408 in UC payments from the State of Florida, followed by approximately $15,263 in UC payments from Pennsylvania.

52. On or about August 25, 2021, Ample International received an ACH transfer—an electronic, bank-to-bank money transfer processed

17

through the Automated Clearing House (ACH) Network—of approximately $4,700.22 from a TD Bank account ending in -1660. The account was opened on or about August 3, 2021 in the name of B.K. On or about August 16, 2021, the account received an ACH deposit from the Virginia UC system of approximately $4,017.60, and on or about August 18, 2021, the account received an ACH deposit from the Pennsylvania UC system of approximately $722.

53. CARLOS A. GRIJALVA, BRUCE JIN, and BRIAN R. CLELAND entered into a series of agreements with one another to make it appear as if their business relationship was related to the processing of payments for COVID-19-related PPE purchased by retail customers.

54. For instance, on or about July 21, 2021, CARLOS A. GRIJALVA sent BRUCE JIN an "operating agreement" dated February 9, 2021, according to which MexUS would "transmit money from Ample Int. clients to MexUS who in turn within 48 hours" would "transmit the money collected to Ample Int. less a 7% transaction fee."

18

55. On or about July 21, 2021, CARLOS A. GRIJALVA also sent BRUCE JIN an email referring to a "BILLING AGREEMENT." The email, which had been prepared for CARLOS A. GRIJALVA by BRIAN R. CLELAND, stated that Group Mex USA Inc., owned by CARLOS A. GRIJALVA, had entered into an agreement with Ample International, which was operated and managed by BRUCE JIN. According to the agreement, dated April 2, 2021, Ample International was supposed to forward to Group Mex USA Inc a "file of customers who have ordered Masks and or Gloves," Group Mex USA Inc was then supposed to "ACH these customers from the information given to them by Ample International," Group Mex USA Inc was then supposed to "deposit the net proceeds from the ACH to Ample International five days later," and Ample International was then supposed to ship "gloves" to the customer.

56. On or about August 13, 2021, CARLOS A. GRIJALVA sent BRUCE JIN an almost identical email referring to a "BILLING AGREEMENT," except this time it was for "COMPANY 1 operated by BRUCE JIN." This email had likewise been prepared for CARLOS A.

19

GRIJALVA by BRIAN R. CLELAND on or about the previous day. This agreement was dated July 21, 2021.

57. On or about August 18, 2021, CARLOS A. GRIJALVA sent an "operating agreement" for COMPANY 1 to BRUCE JIN and copied BRIAN R. CLELAND. CARLOS A. GRIJALVA requested that BRUCE JIN sign and return the agreement. The agreement stated that effective July 19, 2021, "MexUS will transmit money from COMPANY 1 clients to MexUS who in turn within 48 hours will transmit the money collected to COMPANY 1 less a 10% transaction fee." BRUCE JIN was listed as the expected signatory on behalf of COMPANY 1, CARLOS A. GRIJALVA was listed as the expected signatory on behalf of MexUS Inc., and BRIAN R. CLELAND was listed as the witness.

58. On or about the same day, CARLOS A. GRIJALVA sent a second "operating agreement" for COMPANY 1 to BRUCE JIN, again copying BRIAN R. CLELAND. This agreement was identical to the one between COMPANY 1 and MexUS, except that it was between COMPANY 1 and GroupMex. With each operating agreement for COMPANY 1, CARLOS A. GRIJALVA wrote, "Hola Bruce, Please sign

20

the agreement and send it back, gracias..... Saludos, Carlos."

59. BRUCE JIN maintained a warehouse containing COVID-19-related PPE at or around a location in Baldwin Park, CA, which made it appear as if he was operating a company actually selling COVID-19-related PPE.

60. CARLOS A. GRIJALVA and BRIAN R. CLELAND then entered into agreements with payment processing companies who were responsible for taking the bank account information provided by CARLOS A. GRIJALVA and BRIAN R. CLELAND and processing ACH payments from those accounts to companies controlled by CARLOS A. GRIJALVA and BRIAN R. CLELAND. The payment processing companies had the ability to take banking information for a large number of accounts and facilitate the transfer of funds to companies controlled by CARLOS A. GRIJALVA and BRIAN R. CLELAND in large batch transfers.

61. The information that CARLOS A. GRIJALVA and BRIAN R. CLELAND provided to payment processing companies contained the bank account information of identity theft victims whose accounts had

been used to receive fraudulent UC payments from Pennsylvania and other states.

62. CARLOS A. GRIJALVA and BRIAN R. CLELAND falsely led payment processing companies to believe that the banking account information for these victims was being provided, and that funds should be debited from their accounts, because they were customers purchasing COVID-19-related PPE. Payment processing companies then used this banking information to deduct specific amounts of money from the victims' accounts, based on the information provided to them.

63. From on or about August 2021 until on or about February 2022, CARLOS A. GRIJALVA regularly emailed to BRIAN R. CLELAND "weekly reports" containing daily totals, including overall amounts wired, the amount of profit to "B," the amount of profit to the relevant processing company, and the amount of profit remaining for Group Mex USA/MexUS—in other words, the amount of profit to CARLOS A. GRIJALVA and BRIAN R. CLELAND themselves.

64. CARLOS A. GRIJALVA also emailed to BRIAN R. CLELAND summary spreadsheets listing account information of purported

customers of companies operated by BRUCE JIN. For instance, on or about August 1, 2021, CARLOS A. GRIJALVA sent an email with the subject "Ample International ACH." The attached spreadsheet listed approximately 120 separate checking accounts at BMO Harris Bank. A number of the purported accountholders had names similar to one another, including eleven individuals with the name "Lee," four with the name "Leroy," eight with the name "Dolores," and eight with the name "Shannon." In addition, all of the listed account numbers were close to one another. The total amount of funds associated with these accounts was, according to the spreadsheet, over $155,000.

65. CARLOS A. GRIJALVA also emailed to both BRIAN R. CLELAND and BRUCE JIN summary spreadsheets regarding their shared financial activity. For instance, on or about October 25, 2021, CARLOS A. GRIJALVA sent an email with the subject "Large ACH" and a spreadsheet titled "LRG ACH Tickets.xlsx." The spreadsheet contained just under 40 names, all of whom had checking accounts at Wells Fargo Bank. According to the spreadsheet, the total "original amount" associated with these individuals was over $560,000, the total

"amount taken" was over $317,000, and the total amount "left over" was over $243,000. In other words, these individuals, on average, were purported to have purchased over $14,372 in PPE, with several of them having apparently purchased about $40,000 in PPE.

66. BRIAN R. CLELAND and CARLOS A. GRIJALVA coordinated with one another on how to respond when concerns were raised about unauthorized transactions on victims' accounts. Likewise, BRIAN R. CLELAND rehearsed with others what to say if the processing company raised concerns.

67. BRIAN R. CLELAND and CARLOS A. GRIJALVA exchanged information about the number of unemployment claims being made in the United States. For instance, on or about November 9, 2011, BRIAN R. CLELAND sent CARLOS A. GRIJALVA an email with the subject "Unemployment claims." The body of the email contained a report stating that "initial unemployment claims" for the week ending November 5, 2021 were expected to be around 260,000 and the continuing claims for the week ending October 30, 2021 were expected to be over two million.

24

68. Like CARLOS A. GRIJALVA, BRIAN R. CLELAND also emailed spreadsheets containing banking information to payment processing companies in order to receive payments. For instance, on or about March 28, 2022, BRIAN R. CLELAND sent an email to a payment processing company stating, "This goes under Cleco as Carlos and I won't start until Wednesday. These are fresh, Bruce thought it would be easier to send us just the B of A transactions." BRIAN R. CLELAND attached a spreadsheet containing information for nearly 200 Bank of America accounts with bank account numbers that were highly similar to one another.

69. In 2021, Group Mex USA Inc., run by CARLOS A. GRIJALVA and BRIAN R. CLELAND, received nearly $1.5 million in ACH transfers from one payment processing company.

70. During 2021 and 2022, various companies associated with BRIAN R. CLELAND and CARLOS A. GRIJALVA—including MexUS Service Inc, Group Mex USA Inc, CCB Group Inc, GC Accounting Inc, and CLECO, Inc—received over $44 million in ACH transfers from a second processing company. In addition, the same processing company

25

transferred over $500,000 to COMPANY 1 in 2021 and over $134,000 to Jin Commerce LLC in 2022.

71. IDENTITY THEFT VICTIM 1 ("V1") had an account at Chase Bank that was open from on or about July 28, 2021 until on or about October 25, 2021. V1 did not open this account or authorize anyone to open the account on V1's behalf. V1 became aware of the account after receiving bank statements in the mail, which were sent to V1's home in Etters, PA, in the Middle District of Pennsylvania.

72. The account fraudulently opened in V1's name received a series of UC payments from Pennsylvania from on or about August 18, 2021 until on or about September 29, 2021. V1 never applied for or received UC benefits from Pennsylvania.

73. Once deposits were made into the account, the funds were rapidly depleted. Transfers were made to Ample International in August 2021 and September 2021. The bank statements for this account listed a telephone number for CARLOS A. GRIJALVA next to the name of Ample International in transactional details.

74. V1 had no relationship with Ample International and did not

order masks or anything else from that company.

75. IDENTITY THEFT VICTIM 2 ("V2") had an account at Bank of America that was open from on or about January 31, 2022 until on or about July 19, 2022. V2 did not open this account or authorize anyone to open the account on V2's behalf. V2 became aware of the account after receiving bank statements in the mail, which were sent to V2's home in York, PA, in the Middle District of Pennsylvania.

76. The account fraudulently opened in V2's name received a series of UC payments from Pennsylvania from on or about March 9, 2022 until on or about June 15, 2022. These payments were issued in the names of at least three different individuals. Once deposits were made into the account, the funds were rapidly depleted. Transfers were made to Jin Commerce LLC in March 2022, CLECO, Inc. in April 2022, and Jin Commerce LLC again in June 2022. In addition, transfers were made to pay balances on a number of different Visa cards.

77. V2 had no relationship with Jin Commerce LLC or CLECO, Inc. and did not order masks or anything else from those companies.

78. IDENTITY THEFT VICTIM 3 ("V3") had an account at Bank

of America that was open from on or about March 10, 2022 until on or about July 27, 2022. V3 did not open this account or authorize anyone to open the account on V3's behalf. V3 became aware of the account after receiving bank statements in the mail, which were sent to V3's home in Lebanon, PA, in the Middle District of Pennsylvania.

79. The account fraudulently opened in V3's name received a series of UC payments from Pennsylvania from on or about April 20, 2022 until on or about June 22, 2022. These payments were issued in the names of at least two different individuals. Once deposits were made into the account, the funds were rapidly depleted. Transfers were made to CLECO, Inc. in April 2022. In addition, transfers were made to pay balances on a number of different Visa cards, including cards associated with the same names to which funds were debited from V2's Bank of America account.

80. V3 had no relationship with CLECO, Inc. and did not order masks or anything else from that company.

81. IDENTITY THEFT VICTIM 4 ("V4") had an account at Bank of America that was open from on or about February 17, 2022 until on

or about July 19, 2022. V4 did not open this account or authorize anyone to open the account on V4's behalf.

82. The account fraudulently opened in V4's name received a series of UC payments from Pennsylvania from on or about March 30, 2022 until on or about June 22, 2022. These payments were issued in the names of at least three different individuals. Once deposits were made into the account, the funds were rapidly depleted. Transfers were made to CLECO, Inc. in April 2022 and Jin Commerce LLC in June 2022. In addition, transfers were made to pay balances on a number of different Visa cards, including cards associated with the same names to which funds were debited from V2 and V3's Bank of America accounts.

83. V4 had no relationship with Jin Commerce LLC or CLECO, Inc. and did not order masks or anything else from those companies.

84. On or about April 20, 2022 and April 27, 2022, BRUCE JIN forwarded to BRIAN R. CLELAND spreadsheets that BRUCE JIN received from a contact with a 163.com email address. 163.com is an email service provider located in China.

85. These spreadsheets contained banking information for hundreds of individuals with either Citizens Bank, Bank of America, Susquehanna Bank, and Branch Banking accounts. The spreadsheets included V2, V3, and V4, along with amounts to be charged to them. Email addresses purportedly associated with these individuals were also included, but none of them bore any relationship to the names listed. For instance, on or about April 20, 2022, V2, whose initials are "T.A.," was the first individual on the spreadsheet and was supposedly associated with the email address peppermint.patty69@hotmail.com.

86. BRIAN R. CLELAND then forwarded these spreadsheets to the processing company in order to receive payments.

87. IDENTITY THEFT VICTIM 5 ("V5") had an account at Truist Bank that was open from on or about the middle of 2022 until on or about the first half of 2023. V5 did not open this account or authorize anyone to open the account on V5's behalf.

88. The account fraudulently opened in V5's name received a refund from the IRS in the amount of $1,400, and paid to an individual named J.B., on or about September 8, 2022. The very same day, a

payment was made to Jin Commerce, LLC in the amount of $1,360. On or about December 2022 and January 2023, a series of payments from the Ohio Department of Job and Family Services, paid to an individual named D.R., were deposited into the account of V5. Transfers were then made to pay balances on a couple different Visa cards.

89. V5 had no relationship with Jin Commerce, LLC and did not order anything from that company.

90. IDENTITY THEFT VICTIM 6 ("V6") had an account at Truist Bank that was open from on or about the middle of 2022 until on or about the first half of 2023. V6 did not open this account or authorize anyone to open the account on V6's behalf.

91. The account fraudulently opened in V6's name received a refund from the IRS in the amount of $1,400, and paid to an individual named M.D., on or about September 8, 2022. The very same day, a payment was made to Jin Commerce, LLC in the amount of $1,360. The account had no other activity.

92. V6 had no relationship with Jin Commerce, LLC and did not order anything from that company.

31

93. BRUCE JIN received a number of notifications from banks about requests for funds to be returned due to unauthorized ACH transactions. BRUCE JIN sometimes forwarded these messages to the same 163.com email address from whom he received spreadsheets containing banking information.

94. On or about August 26, 2021, an East West Bank representative asked BRUCE JIN to explain the reason for "171 ACH Returns totaling $446,739.50 from various individuals at various financial institutions since 3/22/2021" and asked to know how Ample International Inc. identified its customers. BRUCE JIN falsely claimed, among other things, that the company "sen[t] targeted advertisements through sales representatives to acquire customers."

95. On or about September 28, 2021, BRUCE JIN received a notification from East West Bank about an unauthorized ACH transaction that took place on or about June 21, 2021 in the approximate amount of $8,436.66. BRUCE JIN was asked either to agree to accept the late return or instead provide proof of authorization. In response, BRUCE JIN authorized the "customer" to receive a

"refund" for the full amount, stating, "We don't really care about whether to return or not."

96. BRUCE JIN, BRIAN R. CLELAND, and CARLOS A. GRIJALVA communicated about these unauthorized transactions. For instance, when a representative of East West Bank sent an email to BRUCE JIN on or about September 2021 asking for proof of authorization for an ACH payment, BRUCE JIN forwarded subsequent correspondence on this subject to CARLOS A. GRIJALVA, who forwarded the same to BRIAN R. CLELAND.

97. On various occasions, BRIAN R. CLELAND and BRUCE JIN were also informed either by victims or members of law enforcement that funds had been transferred to them without the authorization of the payor or that accountholders from whom funds had been transferred were the victims of identity theft. When receiving these communications, BRIAN R. CLELAND and BRUCE JIN sometimes took steps to placate the concerned parties in order to prevent the discovery of the fraud scheme.

98. For instance, IDENTITY THEFT VICTIM 7 ("V7") contacted

BRIAN R. CLELAND through LinkedIn on or about September 13, 2021. V7 wrote to BRIAN R. CLELAND that he had "discovered someone opened a fictitious checking account using my name" and was "depositing unemployment checks" into that account. V7 wrote, "My bank statement shows, 'state of nj - to la unemployment.'" V7 explained that on the account statement BRIAN R. CLELAND's number was "listed next to a corporation called MASQ Industries," and the statement showed a debit MASQ Industries for $616.00 on July 7, 2021. V7 explained that he had left a voicemail for BRIAN R. CLELAND using the telephone number in the statement, and V7 requested a response.

99. On or about the same day, BRIAN R. CLELAND responded, "This surprises me and I need to look into this when I return! How was your info acquired? I will call you Thursday upon my return." BRIAN R. CLELAND never responded to V7 following that exchange.

100. On or about July 6, 2021, CARLOS A. GRIJALVA emailed BRIAN R. CLELAND the banking information for ten different individuals, including the TD Bank checking account information for

34

V7.

101. IDENTITY THEFT VICTIM 8 ("V8") discovered that she had an account at Truist Bank on or about April 2022. V8 did not open this account or authorize anyone to open the account on V8's behalf.

102. A bank statement for the account contained a telephone number in the transactional details associated with a withdrawal. V8 attempted to contact this number, which belonged to BRIAN R. CLELAND. V8 then received a response from BRIAN R. CLELAND asking, "Can I call you later?" V8 responded, "Asap. I need to know who you are because I just got a bank statement from this phone number in my name and I'm getting ready to go to the police station about it and it was opened up into my name." BRIAN R. CLELAND did not respond to V8 after that text message.

103. IDENTITY THEFT VICTIM 9 ("V9") had an account at Bank of America that was open from on or about March 10, 2022 until on or about November 4, 2022. V9 did not open this account or authorize anyone to open the account on V9's behalf. V9 became aware of the account after receiving bank statements in the mail, which were sent to

V9's home.

104. On or about April 2022, V9 called the telephone number that V9 found in transactional details in the bank statement. V9 spoke to BRIAN R. CLELAND.

105. On or about April 21, 2022, V9 sent to BRIAN R. CLELAND a picture of a document listing various UC payments that had been deposited into the account fraudulently opened in V9's name. BRIAN R. CLELAND responded, "Received." On or about the same day, BRIAN R. CLELAND transferred approximately $325,400.45 to KB Supply Inc., one of BRUCE JIN's companies.

106. Over the next several weeks, V9 continued to contact BRIAN R. CLELAND in an effort to resolve the situation. On or about May 14, 2022, BRIAN R. CLELAND told V9, "I've been told you're deleted from the data base. I don't have written confirmation. A deposit was mistakenly made to your account and withdrawn when it was discovered with No harm to you. Again everything was deleted and it won't happen again!" V9 then informed BRIAN R. CLELAND that the problem continued, and BRIAN R. CLELAND pledged to "follow up" but

never responded further.

107. On or about April 2, 2022, IDENTITY THEFT VICTIM 10 ("V10") received a bank statement in the mail from Bank of America. The statement was for an account in V10's maiden name. It showed a series of Pennsylvania UC payments between on or about March 14, 2022 and March 23, 2022, payable to an individual with the name J.V.F. On or about March 22, 2022, the statement showed a transfer to Jin Commerce LLC in the amount of $699.89. V10 did not open this account or authorize anyone to open the account on V10's behalf.

108. In response, an officer from a local police department emailed BRUCE JIN at a Gmail address that the officer had located. The subject of the email was "fraud regarding Jin Commerce." The officer wrote, "Sir, I am currently investigating [an] identity theft where a bank account was opened fraudulently. Your business [of] Jin Commerce LLC was found to have a withdraw[al] from the account on 3/22/22 for $699.89." In response, BRUCE JIN claimed, falsely, that V10, whom he described as a "customer," had been found by a "part-time salesman" who had "resigned" from "the company." BRUCE JIN claimed that his

company sold "anti-epidemic materials, including masks, gloves and protective clothing."

109. On or about June 4, 2022, BRIAN R. CLELAND sent to BRUCE JIN a proposed "cooperation agreement" between CLECO, Inc. and COMPANY 2, located in China, on behalf of which BRUCE JIN acted as a representative. According to the proposed terms, CLECO, Inc. was responsible for "completing the collection function from the customer's account using financial collection platforms and tools such as ACH." In exchange, COMPANY 2 was supposed to pay CLECO, Inc. 7% of its proceeds as commission. On or about the following day, BRUCE JIN forwarded to BRIAN R. CLELAND an agreement that appeared to be signed by COCONSPIRATOR 2 as a representative of COMPANY 2. This email was forwarded from the same 163.com email address with which BRUCE JIN had contact on other occasions.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
### 18 U.S.C. § 1956(h)
### (Conspiracy to Launder Monetary Instruments)

110. Paragraphs 1 through 33 and 35 through 109 are incorporated here.

111. From on or about 2020 until on or about 2022, in the Middle District of Pennsylvania and elsewhere, the defendants,

**BRIAN R. CLELAND**, and
**CARLOS A. GRIJALVA,**

did knowingly conspire, confederate, and agree, together and with other persons both known and unknown to the Grand Jury, to commit offenses against the United States in violation of Title 18, United States Code, Section 1956, to wit:

a. To knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is, wire fraud and bank fraud, with the intent to promote the carrying on of specified unlawful activity, that is, wire fraud and bank fraud, and knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful

39

activity in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

b. To knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, wire fraud and bank fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i); and

c. To transport, transmit and transfer and attempt to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, that is, wire fraud and bank fraud, in violation of Title 18, United States Code, Section 1956(a)(2)(A);

and

d. To transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument or funds involving the proceeds of specified unlawful activity, that is, wire fraud and bank fraud, from a place in the United States to or through a place outside the United States, knowing that the funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).

## MANNER AND MEANS OF THE CONSPIRACY

111. During 2021 and 2022, BRIAN R. CLELAND, CARLOS A. GRIJALVA, BRUCE JIN, and COCONSPIRATOR 1 collectively received approximately $59 million in funds derived from fraud, mainly comprised of fraudulent state UC payments. Of that total amount,

BRIAN R. CLELAND and CARLOS A. GRIJALVA handled approximately $46 million in funds derived from fraud.

112. During 2021 and 2022, BRIAN R. CLELAND and CARLOS A. GRIJALVA, and in some cases a relative of CARLOS A. GRIJALVA, used approximately nine different accounts at Bank of America to make over $30 million in transfers from their companies to various companies controlled by BRUCE JIN. These transfers were made primarily to accounts that BRUCE JIN opened at Bank of America, including a Yu Pacific Logistics LLC account and a Jin Commerce LLC account, both of which were opened on or about September 2021.

113. From on or about August 10, 2021 until on or about November 9, 2021, BRIAN R. CLELAND and CARLOS A. GRIJALVA, and in some cases the relative of CARLOS A. GRIJALVA, used the same accounts at Bank of America to make approximately $6,363,612.92 in transfers from their companies to a Bank of America account belonging to COMPANY 1. COCONSPIRATOR 1 was the signatory on the COMPANY 1 Bank of America account.

42

114. BRIAN R. CLELAND and CARLOS A. GRIJALVA, and in some cases the relative of CARLOS A. GRIJALVA, conducted these transfers by visiting Bank of America branch locations and conducting teller transactions in person (i.e., "teller transfers"). BRIAN R. CLELAND and CARLOS A. GRIJALVA, and in some cases the relative of CARLOS A. GRIJALVA, regularly made teller transfers to companies affiliated with BRUCE JIN totaling over $1.5 million per week.

115. From on or about June 1, 2021 until on or about February 2, 2022, BRUCE JIN used approximately six different bank accounts associated with Ample International, Jin Commerce LLC, Yu Pacific Logistics LLC, and Pacific Goods Supply Inc to transfer, primarily through international wire transfers, over $35 million to a bank account in China associated with COMPANY 2. The vast majority of these transfers were derived from funds received from BRIAN R. CLELAND and CARLOS A. GRIJALVA. In addition, from on or about May 17, 2021 until on or about May 12, 2022, BRUCE JIN used approximately four different bank accounts associated with Ample International, Cathy Group Inc, and KB Supply Inc to transfer, primarily through

international wire transfers, over $2 million to other bank accounts in China associated with COCONSPIRATOR 2 and COMPANY 2.

116. On or about November 2021, CARLOS A. GRIJALVA and the aforementioned relative of CARLOS A. GRIJALVA used approximately $1,070,653.38 of the proceeds of this scheme to purchase a single-family home located in or around Simi Valley, California.

117. On or about November 16, 2022, COCONSPIRATOR 1 negotiated a $6,000,000 check from the Bank of America account associated with COMPANY 1 to a CTBC Bank account. On or about January 13, 2023, nearly $1,000,000 of the funds in the CTBC account were used to purchase a luxury vacation property in or around Honolulu, Hawaii.

118. On or about July 31, 2023, $963,449.52 of the funds in the CTBC account were used to purchase a condominium property in Irvine, California.

119. BRIAN R. CLELAND and CARLOS A. GRIJALVA retained several million dollars of the fraudulently obtained UC funds as personal profit.

44

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 3 THROUGH 8
18 U.S.C. § 1343
(Wire Fraud)

120. Paragraphs 1 through 33, 35 through 109, and 111 through 119 are incorporated here.

121. From on or about April 21, 2022 until on or about April 28, 2022, on the dates specified below, in the Middle District of Pennsylvania, and elsewhere, the defendant,

### BRIAN R. CLELAND,

aiding and abetting other persons both known and unknown to the Grand Jury, and with the intent to defraud, did devise and willfully participate in, with knowledge of its fraudulent nature, a scheme and artifice to defraud and obtain money by materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing the above-described scheme and artifice to defraud and deprive, did knowingly transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign

45

commerce, any writing, sign, signal, picture and sound, as described

below:

| Count | On or About | Bank / Account Number | Accountholder | Wire: Approximate Amount and Payee |
|---|---|---|---|---|
| 3 | 4/21/2022 | Bank of America -1862 | V2 (a.k.a., T.A.) | $291.87 transfer to CLECO |
| 4 | 4/21/2022 | Bank of America -1806 | V3 (a.k.a., A.B.) | $351.87 transfer to CLECO |
| 5 | 4/21/2022 | Bank of America -7763 | V4 (a.k.a., D.M.) | $696.87 transfer to CLECO |
| 6 | 4/28/2022 | Bank of America -1862 | V2 (a.k.a., T.A.) | $286.89 transfer to CLECO |
| 7 | 4/28/2022 | Bank of America -1806 | V3 (a.k.a., A.B.) | $763.89 transfer to CLECO |
| 8 | 4/28/2022 | Bank of America -7763 | V4 (a.k.a., D.M.) | $350.89 transfer to CLECO |

All in violation of Title 18, United States Code, Sections 1343 and

2.

## COUNTS 9 THROUGH 14
### 18 U.S.C. § 1344
### (Bank Fraud)

122. Paragraphs 1 through 33, 35 through 109, and 111 through 119 are incorporated here.

123. From on or about April 21, 2022 until on or about April 28, 2022, on the dates specified below, in the Middle District of Pennsylvania, and elsewhere, the defendant,

### BRIAN R. CLELAND,

aiding and abetting other persons both known and unknown to the Grand Jury, knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution, as defined in 18 U.S.C. § 20, and to obtain any of the moneys, funds, credits, assets, securities, and other property owned by, and under the custody or control of, a financial institution, by means of false and fraudulent pretenses, representations, and promises, as described below:

| Count | On or About | Bank / Account Number | Accountholder | Approximate Amount and Payee |
|---|---|---|---|---|
| 9 | 4/21/2022 | Bank of America -1862 | V2 (a.k.a., T.A.) | $291.87 transfer to CLECO |

| 10 | 4/21/2022 | Bank of America -1806 | V3 (a.k.a., A.B.) | $351.87 transfer to CLECO |
|----|-----------|-----------------------|-------------------|----------------------------|
| 11 | 4/21/2022 | Bank of America -7763 | V4 (a.k.a., D.M.) | $696.87 transfer to CLECO |
| 12 | 4/28/2022 | Bank of America -1862 | V2 (a.k.a., T.A.) | $286.89 transfer to CLECO |
| 13 | 4/28/2022 | Bank of America -1806 | V3 (a.k.a., A.B.) | $763.89 transfer to CLECO |
| 14 | 4/28/2022 | Bank of America -7763 | V4 (a.k.a., D.M.) | $350.89 transfer to CLECO |

All in violation of Title 18, United States Code, Sections 1344(1)–(2) and 2.

## COUNT 15
### 18 U.S.C. § 371
### (Conspiracy)

124. Paragraphs 1 through 33, 35 through 109, and 111 through 119 are incorporated here.

125. From on or about 2021 until on or about 2022, in the Middle District of Pennsylvania, and elsewhere, the defendants,

48

BRIAN R.CLELAND, and
CARLOS A. GRIJALVA

did knowingly conspire, confederate, and agree, together and with other persons both known and unknown to the Grand Jury, to commit offenses against the United States and to defraud the United States, that is: to knowingly conduct, control, manage, supervise, direct, and own all or part of an unlicensed money transmitting business, in violation of Title 18, U.S.C. § 1960 (Prohibition of unlicensed money transmitting businesses).

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

126. BRIAN R. CLELAND and CARLOS A. GRIJALVA assisted in the transfer of money from bank accounts belonging to third persons to companies associated with BRUCE JIN and COCONSPIRATOR 1 in exchange for transaction fees.

127. BRIAN R. CLELAND and CARLOS A. GRIJALVA controlled a money transmitting business but did not register that business with the Secretary of the Treasury.

49

## COUNT 16
### 18 U.S.C. § 1960
### (Unlicensed money transmitting business)

128. Paragraphs 1 through 33, 35 through 109, 111 through 119, and 126 through 127 are incorporated here.

129. From on or about 2021 until on or about 2022, on the dates specified below, in the Middle District of Pennsylvania, and elsewhere, the defendants,

### BRIAN R.CLELAND, and
### CARLOS A. GRIJALVA

aiding and abetting one another, did knowingly conduct, control, manage, supervise, direct, and own all or part of a money transmitting business, which affected interstate or foreign commerce, while failing to comply with the money transmitting business registration requirements under 31 U.S.C. § 5330, or regulations prescribed under that section.

All in violation of Title 18, United States Code, Sections 1960 and 2.

## FORFEITURE ALLEGATIONS

130. The allegations contained in Counts 1 through 16 of this Indictment are incorporated here for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982.

131. Upon conviction of an offense set forth in Counts 1 through 16 of this Superseding Indictment, as relevant to each defendant, the defendants,

**BRIAN R.CLELAND,** and
**CARLOS A. GRIJALVA**

shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1), Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982, any property, real or personal, that constitutes, is derived from, or is traceable to the proceeds obtained directly or indirectly from the commission of the offense of which the person is convicted; or that is used to commit, facilitate, or promote, or is intended to be used to commit, facilitate, or promote, the commission of the offense of which the person is convicted;

51

or that is involved in such offenses. The property to be forfeited

includes, but is not limited to, the following:

a. approximately $46,401,749.18 in US currency;

b. the contents of CTBC bank account #3800628016 in the name of COMPANY 1,

c. the contents of Bank of America bank accounts #325110322269 and #325159948439 in the name of COMPANY 1, and

d. a single-family home located at 84-811 Maiola Street Unit 91 Waianae HI 96792, identified at Parcel Number 840291500091, more fully described as:

"FIRST
Unit No. 91 of the Condominium Project known as 'COTTAGES AT MAUNA 'OLU' (the 'Project') , established by Declaration of Condominium Property Regime dated March 8, 2019, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii as Land Court Document No. T-10661092, recorded in the Bureau of Conveyances of the State of Hawaii as Document as Doc. No. A-70090398, as the same may be amended from time to time (the 'Declaration') and as shown on Condominium Map No. 2434 filed in said Office of the Assistant Registrar, and Condominium Map No.

5910 recorded in said Bureau, as the same may be amended from time to time.

Together with those easements appurtenant to the Unit as set forth in the Declaration, which may include the following:

(A) Exclusive easements for the use of Limited Common Elements of the Project which are described in the Declaration as being appurtenant to the Unit.

(B) Nonexclusive easements in the common elements designed for such purposes for ingress to, egress from, utility services for and support of said Unit, in the other common elements for use according to their respective purposes, subject always to the exclusive or limited use of the limited common elements as provided in the Declaration, and in all other units and common elements of the building in which said Unit is located or any adjacent buildings for support.

SECOND:

An undivided 1/120 fractional interest appurtenant to the Unit in all common elements of the Project, as established for said Unit by the Declaration, as tenant in common with all other owners from time to time of undivided interests in and to said common elements.

The land upon which said Condominium Project 'COTTAGES AT MAUNA 'OLU' is located is described as follows:

PARCELS FIRST

All of those certain parcels of land situate at Makaha, District of Waianae, City and County of Honolulu, State of Hawaii, described as follows:

LOT: 1465, area 53,799 square feet, more or less,
1466, area 57,959 square feet, more or less,
1467, area 57,461 square feet, more or less,
1468, area 49,973 square feet, more or less,
1469, area 50,261 square feet, more or less,
1470, area 49,965 square feet, more or less,
1471, area 49,572 square feet, more or less,
1472, area 61,559 square feet, more or less,
1473, area 61,131 square feet, more or less,
1474, area 56,783 square feet, more or less,
1475, area 55,932 square feet, more or less,
1476, area 54,373 square feet, more or less,
1477, area 53,279 square feet, more or less,
1478, area 88,449 square feet, more or less,
1480, area 53,193 square feet, more or less,
1481, area 53,356 square feet, more or less,
1482, area 53,425 square feet, more or less,
and 1590, area 63,831 square feet, more or less, as shown on Map 187, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1052 (amended) of Waianae Company.

Together with a right of way over Lot 632, as shown on Map 15, Lot 649, as shown on Map 17, Lots 1430-A, 1430-B, 1429-B and 1429-C as shown on Map 185.

Together also with a right of way across Lots 975 and 1005, as shown on Maps 58 and 75, and Easement '62' over and across Lots 1248 and 1241, as shown on Map 168 and 131, as set forth by Land Court Order No. 29882, filed on April 18, 1969.

Together also with a right of way across Easement '158', across Lot 1025-B and Easement '159', across Lot 1025-C, and across Easement '160' across Lot 1430-A as shown on said Map 156.

As to Lots 1465 through 1478 and 1480, together with a right of way over Roadway Lot Nos. 1589 and 1590 as shown on said Map 187.

As to Lots 1481 and 1482, together also with a right of way over Roadway Lot No. 1589 as shown on said Map 187 and as set forth by Land Court Order No. 68505, filed on January 16, 1984.

Together also with a nonexclusive easement to use on Lot 1589 for access, utility, and entry gate purposes, as granted by CONFIRMATION OF GRANT OF EASEMENT FOR ACCESS, UTILITY PURPOSES AND ENTRY GATE dated April 2, 1987, filed as Land Court Document No. 1480401 and subject to the terms and conditions contained therein.

Being land(s) described in Transfer Certificate of Title No. 1,172,743 issued to MAKAI VISTAS AT MAKAIIA LLC, a Hawaii limited liability company.

55

PARCEL SECOND

All of that certain parcel of land (being all of the land(s) described in and covered by Royal Patent Number 2339, Land Commission Award Number 9862 to Kanehaku) situate, lying and being at Kekio, Makaha, District of Waianae, City and County of Honolulu, State of Hawaii, being all of Exclusion 3 of Land Court Application No. 1052, and thus bounded and described:

Beginning at the south corner of this parcel of land, the coordinates of said point of beginning referred to Government Survey Triangulation Station "MAKAHA" being 5495.20 feet north and 1502.00 feet west, thence running by azimuths measured clockwise from true South:

1. 156°    46'    30"    514.20 feet along Lot 1031 as shown on Map 107 of Land Court Application 1052;
2. 244° 02'    65.70 feet along Lot 1031 as shown on Map 107 of Land Court Application 1052;
3. 152° 52'    29.90 feet along Lot 1031 as shown on Map 107 of Land Court Application 1052;
4. 245° 50'    65.99 feet along Lot 1031 as shown on Map 107 of Land Court Application 1052;
5. 335° 21'    117.60 feet along Lot 1031 as shown on Map 107 of Land Court Application 1052;
6. 241° 39'    92.70 feet along Lot 1031 as shown on Map 107 of Land Court Application 1052;

56

7. 338° 46;        389.40 feet along Lot 1031 as shown on Map 107 of Land Court Application 1052;
8. 53° 31'        217.00 feet along Lot 1031 as shown on Map 107 of Land Court Application 1052 to the point of beginning and containing an area of 2339 acres, more or less.

## PARCEL THIRD

All of that certain parcel of land situated at Makaha, District of Waianae, City and County of Honolulu, State of Hawaii, described as follows:

LOT 1479-B, area 7,489 square feet, more or less, as shown on Map 217, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii with Land Court Application No. 1052 (amended) of Waianae Company;

Together with a right of way over Lots 672 as shown on Map 46, Lot 649, as shown on Map 19, Lots 1430-A, 1430-B, 1429-B and 1429-C as shown on Map 185.

Together also with a right of way across Lots 975 and 1005, as shown on Maps 58 and 75, and Easement '62' over and across Lots 1248 and 1241, as shown on Map 168 and 131, as set forth by Land Court Order No. 29882, filed on April 18, 1969.

Together also with a right of way across Easement '158', across Lot 1025-B and Easement '159', across Lot 1025-C, and across Easement '160' across Lot 1430-A as shown on said Map 156.

57

Together also with a right of way over Roadway Lot No. 1589 as shown on said Map 187 and as set forth by Land Court Order No. 68505, filed on January 16, 1984.

Together also with a nonexclusive easement to use Lot 1589 for access, utility and entry gate purposes, as granted by CONFIRMATION OF GRANT OF EASEMENT FOR ACCESS, UTILITY PURPOSES, AND ENTRY GATE dated April 2, 1987, filed as Land Court Document No. 148041 and subject to the terms and conditions contained therein.

Being land(s) described in Transfer Certificate of Title No. 1,172,743 issued to MAKAI VISTAS AT MAKAHA, LLC, a Hawaii limited liability company.

AS TO PARCELS FIRST, SECOND, AND THIRD

Said parcel(s) of land being more fully described in Declaration of Condominium Property Regime dated March 8, 2019, filed in the Office of the Assistant Registrar of the Land Court of the State of Hawaii as Land Court Document No. T-10661092, recorded in the Bureau of Conveyances of the State of Hawaii as Document No. A-70090398, as the same may be amended from time to time.

BEING THE PREMISES ACQUIRED BY LIMITED WARRANTY DEED."

e.    the real property located at 7 Iceberg Rose, Irvine, California, 92620-2896 identified at Parcel Number 935-45-697, more fully described as:

58

"...A CONDOMINIUM COMPRISED OF:

PARCEL 1: AN UNDIVIDED INTEREST IN COMMON AREA:

A ONE/TWELFTH (1/12) UNDIVIDED FRACTIONAL FEE INTEREST AS A TENANT-IN-COMMON IN AND TO THE PHASE I COMMON AREA AS SHOWN AND DESCRIBED ON THAT CERTAIN CONDOMINIUM PLAN RECORDED ON SEPTEMBER 28, 2005, AS INSTRUMENT NO. 2005-765033 IN THE OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA (THE "PHASE I CONDOMINIUM PLAN"). SAID PHASE I COMMON AREA CONSISTS SOLELY OF AIRSPACE LOCATED ABOVE LOT 7 OF TRACT 16676, WHICH TRACT IS SHOWN ON A MAP RECORDED IN BOOK 866, PAGES 22 THROUGH 33, INCLUSIVE, OF MISCELLANEOUS MAPS IN THE OFFICE OF THE COUNTY RECORDER FOR ORANGE COUNTY, CALIFORNIA.

PARCEL 2: THE CONDOMINIUM UNIT:

UNIT 90, AS SHOWN AND DESCRIBED ON THE PHASE I CONDOMINIUM PLAN AND AS DEFINED IN THAT CERTAIN 'SUPPLEMENTAL DECLARATION OF COVENANTS, CONDITIONS AND

59

RESTRICTIONS, RESERVATION OF EASEMENTS, AND ALTERNATIVE DISPUTE RESOLUTION PROCEDURES FOR BOWEN COURT RECORDED ON SEPTEMBER 28, 2005 AS INSTRUMENT NO. 2005-767447, IN THE OFFICIAL RECORDS OF ORANGE COUNTY, CALIFORNIA, AS SAME MAY BE RESTATED AND/OR AMENDED FROM TIME TO TIME (THE "DECLARATION")

f.    a single-family home located at 3161 Omega Ave Simi Valley CA 93063, identified at Parcel Number 616-0-182-085, more fully described as:

"the real property in the City of Simi Valley, County of Ventura, State of California, described as: Lot 8 of Tract No. 2648 as per Map recorded in Book 87, Page 64 of Maps, in the Office of the County Recorder of Ventura County, California. Also Known as: 3161 Omega Avenue, Simi Valley, CA 93063"

132. If any of the property described above, as a result of any act or omission of the defendants:

a.    cannot be located upon the exercise of due diligence;

60

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

All pursuant to 18 U.S.C. § 982(a)(1) and 982(b); Title 21, United States Code, Section 853(p); and Title 28, United States Code, Section 2461(c).

A TRUE BILL

JOHN C. GURGANUS
Acting United States Attorney

_____
RAVI ROMEL SHARMA
Assistant United States Attorney

_____
FOREPERSON

_____
Date

61